**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| U.S. VENTURE, INC., | : | No. 51 MAP 2020 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 78 CD |
| | : | 2019 dated February 18, 2020 |
| v. | : | Affirming the Order of the |
| | : | Commonwealth Board of Claims |
| | : | dated December 28, 2018 at No. |
| COMMONWEALTH OF PENNSYLVANIA, | : | 4180 |
| DEPARTMENT OF COMMUNITY AND | : | |
| ECONOMIC DEVELOPMENT; | : | ARGUED: March 10, 2021 |
| COMMONWEALTH FINANCING AGENCY; | : | |
| AND SCOTT D. DUNKELBURGER, | : | |
| EXECUTIVE DIRECTOR OF THE | : | |
| COMMONWEALTH FINANCING AGENCY, | : | |
| | : | |
| Appellees | : | |

**OPINION**

**JUSTICE DONOHUE**                                        **DECIDED:  July 21, 2021**

U.S. Venture, Inc. ("Venture") appeals from the decision of the Commonwealth

Court affirming the determination of the Pennsylvania Board of Claims ("Board") that its

dispute with the Commonwealth[1] involving two grant agreements was not within the

---

[1]  Various Commonwealth entities are involved in this case.  The Commonwealth
Financing Authority ("CFA") was established in 2004 as an independent agency of the
Department of Community and Economic Development ("DCED") to administer economic
stimulus packages in Pennsylvania. COMMONWEALTH FIN. AUTH.,
https://dced.pa.gov/programs-funding/commonwealth-financing-authority-cfa.

subject matter jurisdiction of the Board and that its claim was barred by sovereign immunity. For the reasons set forth herein, we find that any ambiguity within the relevant statutory provisions must be resolved in favor of preserving sovereign immunity. Alternatively, we find that these written grant agreements were in fact "grants," which are not subject to the limited waiver of sovereign immunity and affirm.

## I. Factual and Procedural History

Within the Alternative Energy Investment Act, 73 P.S. §§ 1649.101 – 1649.2901, the General Assembly authorized the CFA, with administrative support from the DCED, to, inter alia, provide "grants to businesses or nonprofit economic development organizations for alternative energy production projects." 73 P.S. § 1649.307(a)(1)(iii). Pursuant to this authority, the Commonwealth created the Alternative and Clean Energy ("ACE") program, which was designed to "provide[ ] financial assistance in the form of grant and loan funds that will be used by eligible applicants for the utilization, development and construction of alternative and clean energy projects in the Commonwealth." Alternative and Clean Energy Program Guidelines at 3 (unpaginated); R.R. 343a.[2]

---

Scott Dunkelberger, the Executive Director of the CFA, was sued as an individual but those claims were dismissed on the basis that the Board has jurisdiction only against "agencies" and not individuals. We also note that the caption mistakenly spelled Mr. Dunkelberger's name and erroneously designated the Commonwealth Financing Authority as the Commonwealth Financing Agency.

For ease of reference, we collectively refer to these entities collectively as the Commonwealth.

[2] The guidelines were included as Exhibit 6 to Venture's Proposed Findings of Fact and Conclusions of Law, 9/26/2018. For ease of reference, the corresponding reproduced record cite is included. *See infra* note 3.

Applicants applied for funds through a website. Deposition of Ryan Emerson, 8/9/2018, at 14; R.R. 248a.[3]

In May 2014, Venture, a Wisconsin corporation, applied for two separate ACE grants through the website. Both applications proposed adding compressed natural gas ("CNG") fuel pumps to existing fueling stations. The forms submitted by Venture through the website indicated that the first project concerned an existing fueling station in Fredericksburg, Pennsylvania. Responding to the form question, "What do you plan to accomplish with this project?" Venture stated that the "[Environmental Protection Agency] estimates that replacing diesel vehicles with CNG vehicles" would significantly reduce harmful emissions and that "[b]efore fleets will feel confident in converting to CNG, however, a reliable nationwide refueling infrastructure must be in place." R.R. 69a. Venture noted that GAIN Clean Fuel, a division of Venture, "has partnered with Pacific Pride Services … to provide two fast-fill dispensers with two pumps each to dispense CNG at Pacific Pride's existing station" in Fredericksburg. This station "is located along … a major east-west transportation route" and "will play a vital role in allowing [e]ast-coast fleets to convert to CNG." *Id.* Venture stated that GAIN Clean Fuel "has entered into an agreement with … a nationwide freight transportation company" that required said company to "purchase an average of 118,000 [diesel gallon equivalent] / year from the Fredericksburg station, thus guaranteeing the reduction" of various harmful emissions. *Id.* Venture sought $643,489 in funds, which would cover 40% of the total project costs.

---

[3] At an evidentiary hearing before the Board, several exhibits were admitted without objection. N.T., 8/27/18, at 15-23. Those exhibits included the deposition and the two written agreements. Those agreements, in turn, contained the grant applications and other documents as appendixes.

The second application likewise involved an existing fueling station. Venture's application stated that "GAIN … has partnered with Silvi Concrete … to build a high-speed public fueling station with private slow-fill lanes for Silvi's new fleet of CNG-fueled concrete mixers." R.R. 108a. Additionally, a new "public fast-fill portion" would be open to all travelers. As with the Fredericksburg project, the pumps would be added to an existing property. Venture stated that "[t]he existence of this station will allow for conversion of trucks from diesel to cleaner-burning CNG by providing the necessary support infrastructure, and will also improve air quality in the region" by lowering emissions. *Id.* Venture sought $784,844 to cover 40% of the project. "The bulk of the project costs are associated with the public portion of the station, with only $197,000 being needed for the private portion." *Id.* Grant money would be used for "purchasing and installing the CNG equipment as well as covering the additional costs associated with opening the facility to the public[.]" *Id.*

In October 2014, the CFA sent Venture two funding commitment letters approving grants in the amount of $643,389 and $547,047 for the two CNG stations. Each letter stated that "[t]he grant will be used by [Venture] for the construction of a CNG fueling station[.]" R.R. 19a, 26a. Venture and the Commonwealth thereafter executed the documents, each titled as an "Alternative and Clean Energy Grant Agreement," with the opening paragraph describing the document as a "[c]ontract entered into by and between the Commonwealth" and Venture. R.R. 33a, 73a. Each stated that the grant money was to be made available "as may be required by the Grantee [Venture] and authorized by the Grantor [Commonwealth], subject to the condition that it shall be used by the Grantee to

carry out the activities described in the application submitted by the Grantee … and which is incorporated herein by reference." *Id.*

Venture completed the two projects in 2017 and sought payment from the CFA. Executive Director Scott Dunkelberger[4] denied the request via a letter stating that the agency was "unable to disburse the grant funds based on how [Venture] structured the construction and financing of the project," indicating that the "ACE funds were specifically awarded to pay construction costs incurred by [Venture]." R.R. 111a. Dunkelberger explained that because Venture "did not incur construction costs, instead electing to lease the CNG equipment/station[,] … there are no eligible costs for the ACE grant to reimburse." *Id.* He noted that "[t]he application stated that the grant funds would be used to purchase equipment and pay construction costs, not to make lease payments." *Id.* Finally, the letter stated that the CFA declined reimbursement for a second and independent reason, namely that Venture failed to use a competitive bid process to select its own contractor, as required by the written agreements. *Id.*

Venture filed a statement of claim with the Board, a statutory body created to adjudicate certain contractual claims involving the Commonwealth. The Commonwealth filed preliminary objections alleging that the Commonwealth did not waive its sovereign immunity for "matters arising from grant contracts." Preliminary Objections, 02/15/2018, at 3. The Commonwealth averred that Venture failed to allege that the Board had jurisdiction and set forth its view that the Board has jurisdiction only when it is established

---

[4] As noted, *see supra* note 1, the caption mistakenly spelled Mr. Dunkelberger's name. It also erroneously designated the Commonwealth Financing Authority as the Commonwealth Financing Agency. All claims against Mr. Dunkelberger were dismissed on the basis that the Board has jurisdiction only against "agencies" and not individuals.

pursuant to the Procurement Code (the "Code"), 62 Pa.C.S. §§ 101 - 2311. *Id.* ¶¶ 8-15. The Commonwealth argued that the Code limits the Board's jurisdiction in the present case pursuant to Section 102(f):

## § 102. Application of part

\* \* \*

> **(f) Application to grants**.--This part does not apply to grants. For the purpose of this part, a grant is the furnishing of assistance by the Commonwealth or any person, whether financial or otherwise, to any person to support a program. The term does not include an award whose primary purpose is to procure construction for the grantor. Any contract resulting from such an award is not a grant but a procurement contract.

62 Pa.C.S. § 102(f).

The Commonwealth noted that "Venture correctly referred to the two contracts in question as 'grants' throughout its statement of claim." Preliminary Objections, 02/15/2018, ¶ 12. The Commonwealth briefly addressed the word "construction" in Section 102(f), observing that Section 103 defines that term to refer to "the process of building, altering, repairing, improving or demolishing any public structure or building or other public improvements of any kind to any public real property." 62 Pa.C.S. § 103. Additionally, the statute provides that the "term does not include the routine operation or maintenance of existing structures, buildings or real property." *Id.* Referencing the grant agreements at issue, the Commonwealth argued that "[n]either Contract A nor Contract B were [sic] awarded for the purpose of procuring construction for [the Commonwealth]." Preliminary Objections, 02/15/2018, ¶ 14. Venture responded that Section 102(f) "expressly includes within this Board's jurisdiction awards of grant money 'whose primary purpose [was] to procure construction for the grantor[.]'" R.R. 128a. Venture insists that

the General Assembly "has waived sovereign immunity for claims arising from procurement contracts, like the contracts in this case." *Id.* ¶ 21.

The Board determined that there were outstanding questions of fact that were relevant to its jurisdiction and held an evidentiary hearing. Order, 3/20/2018, at 1. Following that hearing, the parties submitted proposed conclusions of fact and law, with each side elaborating on the foregoing points. The Board issued its conclusions and a supporting opinion. Factually, the Board determined that there was "no evidence that the [Commonwealth] and Venture had any communication after the grant documents were executed until the time that Venture completed the projects and sought payment[.]" Board's Final Opinion and Order, 12/28/2018, at 2. Likewise, there was no evidence that the Commonwealth "drafted, reviewed or approved" the various materials prepared "for the actual construction of the CNG fueling station projects," nor was there any evidence that the Commonwealth "supervised the construction or participated in any way regarding the actual construction" of the CNG stations. *Id.* The Board also found that the CNG stations were "publicly accessible, meaning that members of the public driving CNG vehicles could purchase fuel at the stations." *Id.* at 3. However, the stations "were both constructed on privately-owned property" and the equipment for dispensing the fuel "is not owned (in whole or in part) by the [Commonwealth]" and the Commonwealth had no ownership or interest in the land or the facilities. *Id.*

The Board issued conclusions of law based on these factual findings. It characterized Section 102(f) as excluding the Board from deciding cases involving "grants," but also ruled that the term "grants" does not include an award whose primary purpose is to procure construction for the grantor. *Id.* at 7. The Board indicated that to

prosecute successfully its statement of claim, Venture was required to "establish that the written grant agreements at issue … should be considered procurement contracts" under Section 102(f). *Id.* To do so, Venture

> must establish that the primary purpose of these grant agreements was to 'procure construction for the grantor,' that is, that these written agreements had the primary purpose of procuring the building of a public structure, or improvement to public real property, for the Commonwealth Financing Authority, the Department of Community and Economic Development or, in the broadest sense, the Commonwealth of Pennsylvania.

*Id.*

Because the term "public" is not defined by the Code, the Board consulted legal and ordinary dictionaries. Quoting Black's Law Dictionary entries for the terms "public," "public structure," "public building," "public improvement," and "public real property," the Board noted that each "always appear to include something **owned** by a governmental entity, but **sometimes** reference something 'open to' or 'accessible by' the general public[.]" *Id.* at 8. The Board determined that the term was ambiguous and resolved the ambiguity in the Commonwealth's favor. Its principal analysis rested on numerous cases where the term "public" and its variations like "public building" were specifically analyzed and held to require governmental control. It deemed the "[m]ost persuasive of these cases" those involving the Separations Act, 71 P.S. § 1618, which involves expenditures of public funds on construction projects for the Commonwealth and/or its political subdivisions and agencies." *Id.* at 9. While "not exactly contiguous with the Procurement Code," the Separations Act was sufficiently similar such that its analysis was persuasive. *Id.* Accordingly, the Board sustained the preliminary objections on sovereign immunity grounds.

## II. Commonwealth Court decision

An en banc panel of the Commonwealth Court affirmed. *U.S. Venture, Inc. v. Commonwealth*, 227 A.3d 462 (Pa. Commw. 2020) (en banc). The Commonwealth Court commenced its analysis by acknowledging that its primary task was to discern legislative intent and began with an examination of whether the term "public" was ambiguous. Venture cited three precedents cited in support of that position: *Commonwealth v. Miles*, 681 A.2d 1295 (Pa. 1996); *Limley v. Zoning Hearing Bd. of Port Vue Borough*, 625 A.2d 54 (Pa. 1993); and *Carney v. Penn Oil Co.*, 140 A. 133 (Pa. 1928).[5] Although these cases involved the use of the term "public" as referring to "publicly-accessible," the Commonwealth Court determined that they were of limited utility because none shed any light on what the General Assembly intended when using the same term in Section 103 of the Code. Nevertheless, the three cases did establish that "public" may be reasonably understood in at least two distinct ways: publicly-owned and publicly-accessible. The court thus concluded that the term was ambiguous.

To resolve the ambiguity, the Commonwealth Court referenced Section 1921(c) of the Statutory Construction Act, 1 Pa.C.S. §§ 1901-1991, which lists a number of basic principles that may be considered to determine legislative intent when statutory language

---

[5] *Miles* described a murder committed at a shopping center open to the public as a "public shopping center." *Limley* involved the question of whether a proposed use as a "public restaurant and bar" in a building that formerly housed a "private club" was a new use or a continuing use. The "public" reference was used to distinguish between a private club and a restaurant opened to the public. And *Carney* involved a nuisance order against a "public service gasoline and filling station," thus referencing as a "public structure" a gas station that serviced the public.

is ambiguous.[6]  The panel agreed with the Commonwealth that the fifth factor, "[t]he former law, if any, including other statutes upon the same or similar subjects," was particularly relevant in this case.  Moreover, Section 1922 lists five presumptions that may be employed to ascertain legislative intent, including that "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language."  1 Pa.C.S. § 1922(4).

The Commonwealth Court acknowledged that other cases have analyzed the meaning of "public" in statutes concerning similar subjects and agreed with the Board that interpretations of the term "public" as it appears in those related statutory schemes was a relevant consideration.  It discussed *Tragesser v. Cooper*, 169 A. 376 (Pa. 1933), where this Court held that the term "public building" as used in the General Borough Act of May 4, 1927, P.L. 519, 634, required the government to own the building.  The statute examined in *Tragesser* discussed the specifications "for the erection or alteration of any public building," which the *Tragesser* Court held meant "any building owned or to be owned by the borough and used or to be used for public purposes."  *Tragesser*, 169 A. at 378.  The *Venture* court stated that the General Borough Act, like the Code, "address[ed] the expenditure of public funds for construction projects[.]"  *Venture*, 227 A.3d at 470. Thus, pursuant to the foregoing statutory construction principles, this Court determined

---

[6]  The statute lists the following eight non-exclusive factors: (1) The occasion and necessity for the statute; (2) The circumstances under which it was enacted; (3) The mischief to be remedied; (4) The object to be attained; (5) The former law, if any, including other statutes upon the same or similar subjects; (6) The consequences of a particular interpretation; (7) The contemporaneous legislative history; and (8) Legislative and administrative interpretations of such statute.  1 Pa.C.S. § 1921(c).

that for statutory schemes involving public expenditures, "public" does not extend to that which is merely accessible to the public.

The Commonwealth Court found further support for this interpretation in its precedents. In *Mechanical Contractors Ass'n of Northwestern Pennsylvania v. Senior Citizen Health Care Council of Erie County, Pennsylvania, Inc.*, 674 A.2d 752, 753 (Pa. Commw. 1996), one of the questions presented involved the meaning of the term "public building" under a statute that applied to "certain contracts for the erection, construction, and alteration of any public building." *Venture*, 227 A.3d at 470 n.6. The Commonwealth Court noted that *Mechanical Contractors* "explained that a 'public building' for the purposes of the [statute] is one owned or to be owned and used by a government entity (or its alter ego) for a government-authorized public purpose." *Id.* at 472 (quoting 674 A.2d at 755).

Drawing on these sources, the Commonwealth Court determined that the Code and these related schemes broadly serve a similar purpose, which may be roughly defined as promoting public transparency when the Commonwealth awards contracts. Hence, the statutes all concerned the "same subject." As a result, it concluded that the General Assembly intended that the Code likewise be understood to mean that "public" required governmental ownership and/or control, not merely something that is accessible to the public. Thus, as applied to Section 102(f), sovereign immunity applied and barred suit.

> Because the CNG fueling stations are not public structures and, therefore, do not fall within the Procurement Code's definition of construction, the [g]rants do not constitute "an award whose primary purpose is to procure construction for the grantor" under Section 102(f) of the Procurement Code, and sovereign immunity bars Petitioner's action.

*Id.*

### III. The Code and Sovereign Immunity

We granted Venture's petition for allowance of appeal on the following question:

> Whether the Commonwealth Court erred in utilizing a narrow statutory construction of the ambiguous definition of "construction," which refers to "public structures or buildings," set forth in the Procurement Code, to find that the Board has no subject matter jurisdiction over [Venture]'s breach of contract claims, thus leaving [Venture] without any legal remedy?

*U.S. Venture, Inc. v. Dep't of Cmty. & Econ. Dev.*, 238 A.3d 330 (Pa. 2020).

Venture alleges that we must strictly construe the relevant statutory language in the Code in its favor. In this regard, Venture focuses on the Commonwealth Court's citation to Section 1928(b)(7) of the Statutory Construction Act, which provides that certain provisions of statutes must be strictly construed, including "[p]rovisions decreasing the jurisdiction of a court of record." *Venture*, 227 A.3d at 466 (quoting *Dep't of Health v. Data-Quest, Inc.*, 972 A.2d 74, 78-79 (Pa. Commw. 2009)).[7] Venture argues that the Commonwealth Court ignored this foundational statutory construction principle.

---

[7] The Board is considered to be a court of record. Pursuant to 42 Pa.C.S. § 321, "[e]xcept as otherwise provided … every court of this Commonwealth shall be a court of record with all the qualities and incidents of a court of record at common law." This Court has recognized the Board as a court. In *Merchants' Warehouse Co. v. Gelder*, 36 A.2d 444, 449 (Pa. 1944), we held that when the Board of Claims "constitute[s] … the first tribunal provided by the Commonwealth for the settlement and adjustment of claims against it, they are not acting as a part of the executive branch of the government of the Commonwealth and are not subject to the Administrative Code. They are a judicial tribunal." *Id.* (citation and internal quotations omitted). We thus consider the Board a "court" pursuant to Article V, Section 1 of the Pennsylvania Constitution. *Id.*; *see also Foley Bros., Inc. v. Commonwealth of Pa. Dep't of Highways*, 163 A.2d 80, 86 (Pa. 1960) ("[W]e consider the Board as a judicial tribunal.").

"Provisions decreasing the jurisdiction of a court of record must be explicit and must be strictly construed. The Commonwealth Court's opinion and order ignores both of these principles[.]" Venture's Brief at 13. The Commonwealth, on the other hand, argues that Venture's argument conflicts with the principle that waivers of sovereign immunity must be construed narrowly. *See Clipper Pipe & Serv., Inc. v. Ohio Cas. Ins. Co.*, 115 A.3d 1278, 1282 (Pa. 2015) ("[A]nother relevant rule of statutory construction prescribes that statutes in derogation of sovereignty should be construed strictly in favor of the sovereign."). Essentially, the parties posit that resolving this dispute requires this Court to select which of these two presumptions is more consistent with legislative intent.

A brief discussion of sovereign immunity and the Commonwealth's liability for contractual claims supplies critical background for the parties' arguments. "Under the Pennsylvania Constitution, the Commonwealth enjoys sovereign immunity from lawsuits." *Sutton v. Bickell*, 220 A.3d 1027, 1034-35 (Pa. 2019) (citations omitted). The Pennsylvania Constitution confers the legislative branch with the power to permit suits against the Commonwealth at its discretion. Pa. Const. art. I, § 11. The General Assembly has declared that the Commonwealth "shall continue to enjoy sovereign immunity … and remain immune from suit except as the General Assembly shall specifically waive the immunity." 1 Pa.C.S. § 2310.

Regarding the Commonwealth's waiver of sovereign immunity for contractual matters, we have noted that "at common law sovereign immunity barred a claimant from asserting a claim against the Commonwealth based upon contract." *Shovel Transfer & Storage, Inc. v. Simpson*, 565 A.2d 1153, 1155 (Pa. 1989). "The present immunity scheme is based entirely on the constitutional and statutory law, since this Court has

deemed the common-law justifications for sovereign immunity to be invalid." *Sci. Games Int'l, Inc. v. Commonwealth*, 66 A.3d 740, 755 n.21 (Pa. 2013) (citation omitted). *Scientific Games* recognized "the salient point that sovereign immunity extends into the contract arena, unless specifically waived by the General Assembly." *Id.* at 753 n.17 (emphasis omitted). Of particular relevance here, the Code "waive[s] sovereign immunity as a bar to claims against Commonwealth agencies brought in accordance with sections 1711.1 (relating to protests of solicitations or awards) and 1712.1 (relating to contract controversies) and Subchapter C (relating to Board of Claims) but only to the extent set forth in this chapter." 62 Pa.C.S. § 1702(b) (footnote omitted).

Next, Subchapter C, which authorizes the Board of Claims, is codified at 62 Pa.C.S. §§ 1721-1726. These provisions were enacted by Act of Dec. 3, 2002, No. 2002-142, P.L. 1147. Previously, the Board was created by the Act of May 20, 1937, P.L. 728, No. 193 (as amended and reenacted 72 P.S. §§ 4651-1 - 4651-10) (repealed) (the "Board of Claims Act"). The Board of Claims Act's enabling provision, 72 P.S. § 4651-1, "created … the Board of Claims, the duty of which shall be to arbitrate claims against the Commonwealth arising from contracts entered into by the Commonwealth[.]" Section 4651-4, entitled "Powers of board," established the Board's jurisdiction. It provided that the "Board of Claims shall have exclusive jurisdiction to hear and determine all claims against the Commonwealth arising from contracts hereafter entered into with the Commonwealth, where the amount in controversy amounts to $300.00 or more." 72 P.S. § 4651-4.

In contrast, Subchapter C's jurisdictional provision confers the Board with exclusive jurisdiction only over the following contracts:

(1) A contract entered into by a Commonwealth agency in accordance with this part and filed with the board in accordance with section 1712.1 (relating to contract controversies).

(2) A written agreement executed by a Commonwealth agency and the Office of Attorney General in which the parties expressly agree to utilize the board to arbitrate disputes arising from the agreement.

(3) Unless otherwise provided by law, a contract entered into by a Commonwealth agency involving real property interests in which the Commonwealth agency is the respondent.

62 Pa.C.S. § 1724(a).

The issue here is whether Section 1724(a)(1) applies to the current dispute,[8] which in turn depends upon whether these contracts were "in accordance with this part." As explained, this case involving grants centers on the interpretation of Section 102(f), particularly its language stating that "[t]he term does not include an award whose primary purpose is to procure construction for the grantor. Any contract resulting from such an award is not a grant but a procurement contract." 62 Pa.C.S. § 102(f).

## IV. Parties' Arguments

### Venture

Venture agrees with the Commonwealth Court that the undefined term "public" as included within the defined term "construction" is ambiguous and offers two arguments to support a conclusion that the General Assembly intended the broader interpretation of that term. These arguments jointly discuss the jurisdictional aspects involved when sovereign immunity is at issue. Briefly stated, the Board only has subject matter jurisdiction if the General Assembly has waived sovereign immunity. Venture claims that we thus must choose between affirming the Commonwealth Court's narrow interpretation

---

[8] There has been no suggestion that the other two paragraphs apply.

of the term "public," which has the effect of decreasing the Board's jurisdiction, and recognizing the alternative and broader interpretation, which would have the effect of increasing, or at least preserving, the Board's jurisdiction.

Venture argues that proper application of the Statutory Construction Act, 1 Pa.C.S. §§ 1901-1991, compels that result. Venture emphasizes the General Assembly's instruction that "[p]rovisions decreasing the jurisdiction of a court of record" shall be strictly construed. 1 Pa.C.S. § 1928(b)(7). Venture asserts that if the General Assembly had intended to decrease the Board's jurisdiction, we must presume that it would have used explicit language. For example, the General Assembly easily could have said that "public" meant "owned or controlled by the Commonwealth." The en banc opinion "restricted the scope of the Board's jurisdiction to exclude Commonwealth contracts for the construction of buildings open to the public without explicit language in the Procurement Code limiting the meaning of 'construction' to publicly owned buildings or structures." Venture's Brief at 19.

In support, Venture cites *Employers Insurance of Wausau v. Commonwealth Department of Transportation*, 865 A.2d 825 (Pa. 2005), a case involving a contractual assignment claim. "[U]nder the law of assignment, Wausau stepped into Lang's shoes *vis-à-vis* PennDOT and, thus, clearly presents a claim sounding in contract." *Id.* at 831. As relevant to Venture's arguments, the *Wausau* Court went on to hold that the Board had jurisdiction to decide the assignment claim, reasoning that now-repealed 72 P.S. § 4651-4 "is silent regarding the preclusion of the generally permissible assignment of rights" and does not "identify any restrictions on the non-Commonwealth party preventing them from bringing a claim based upon the assignment of rights." *Id.* Additionally, while

the contracts at issue were executed before the repeal of 72 P.S. § 4651-4, we stated that "[t]he repealed provision of Section 4 … is now covered in 62 Pa.C.S. § 1724(a)(1), which is, in relevant part, substantively identical to the repealed section." *Id.* at 830 n.7. We then held that the Board could hear the equitable subrogation claim, observing that "[i]t is thus readily apparent that Pennsylvania's legislative scheme intended to vest the Board of Claims with expansive jurisdiction to decide disputes concerning contracts involving the Commonwealth." Venture's Brief at 20 (quoting *Wausau*, 865 A.2d at 833). Comparably, Venture observes that the General Assembly intended to vest the Board with expansive jurisdiction and could have, but did not, explicitly restrict the term "public" to mean something "owned by the government." According to Venture, we are to look to the common and approved usage as found in the dictionary. *Commonwealth v. Hart*, 28 A.3d 898, 909 (Pa. 2010) ("As the legislature did not define the term, its common and approved usage may be ascertained by examining its dictionary definition."). Because "public" can mean either "accessible to the public" or "owned / controlled by the government," this Court should resolve the ambiguity to ensure that the Board has jurisdiction.

Venture connects the foregoing principles to the broader public policy principle of ensuring that a litigant has a forum to pursue a claim against the Commonwealth. Venture cites *Department of Health v. Data-Quest, Inc.*, 972 A.2d 74 (Pa. Commw. 2009), wherein the Commonwealth Court explained that the very creation of the Board reflects a strong public policy purpose of providing a forum where claimants could seek redress for contractual claims that would otherwise be barred by sovereign immunity. The *Data-Quest* Court cited *Wausau* as authority for the proposition that the repealed jurisdictional

statute was substantively identical to Section 1724(a).  *Id.* at 79 ("In *Wausau* the court concluded that the relevant portion of Section 1724(a)(1) is substantively identical to Section 4 of the Board of Claims Act.").

Here, the General Assembly did not explicitly express an intent to limit the Board's jurisdiction to contracts involving publicly-owned structures.  By failing to use language that would make its intent clear, "section 102(f) does not depart from the salutary public policy of permitting Venture its day in court[.]"  Venture's Brief at 22.  Venture also observes that the General Assembly has, in other sovereign immunity contexts, explicitly restricted waivers of sovereign immunity to property possessed by the Commonwealth. For example, Section 8542(b)(3) of the Political Subdivision Tort Claims Act waives sovereign immunity for actions involving the "care, custody or control of real property in the possession of the local agency[.]"  42 Pa.C.S. § 8542(b)(3).

Relatedly, Venture criticizes the Commonwealth Court's examination of the General Borough Act and the Separations Act as involving the "same subject matter" under 1 Pa.C.S. § 1921(c)(5) for purposes of resolving the ambiguity.  The Commonwealth Court determined that those statutory schemes and the Code share similar goals and used those cases as persuasive authority for an interpretation of "public" that requires government ownership or control.  Venture argues that these schemes do not involve the "same subject matter" because those schemes do not involve the conferral of jurisdiction.  In other words, plaintiffs suing the government in those cases could argue the substantive merits of what "public" meant without clearing any jurisdictional hurdle.

Moreover, Venture contends that the Commonwealth Court ignored the balance of that statutory provision because a court is to look to the "same … subjects."  1 Pa.C.S. §

1921(c)(5). Shifting focus from the meaning of the word "public," Venture argues that the Commonwealth Court failed to examine cases involving the "same" subject. In this case, the "same" subject is now-repealed 72 P.S. § 4651-4. Venture claims that prior to 2002 the Board would have had jurisdiction over this contractual claim. *See Shovel Transfer & Storage, Inc. v. Simpson*, 565 A.2d 1153, 1156 (Pa. 1989) ("We have construed the language of the enabling statute to mean that the Board of Claims is empowered to entertain *all contractual claims* against the Commonwealth" provided the amount in controversy exceeded $300). Despite the specific exclusion of grants from the 2002 Code, Venture claims that the General Assembly would have intended the same result here and the enactment of Subchapter C within the Code did not substantively alter the Board's jurisdiction. Venture's Brief at 29-30 ("[I]n light of well -settled precedent and the lack of clear legislative intent, we agree that the provisions of the Procurement Code have not altered or limited the exclusive jurisdiction of the Board of Claims over this matter.") (quoting *Hanover Ins. Co. v. State Workers' Ins. Fund of Com.*, 35 A.3d 849, 856 (Pa. Commw. 2012)). Venture claims that a better use of the "same subject" would "draw from case law interpreting the legislative intent behind the creation of the Board prior the 2002 amendments to the Procurement Code." *Id.* at 28.

Finally, Venture cites public policy issues in support of its interpretation. Affirming the Commonwealth Court means that the Commonwealth can breach these contracts with impunity. As applied here, the Commonwealth executed two written contracts requiring it to pay over $1,000,000 to promote the use of clean burning fuels, which it presumably desires to do in more locations than the two stations at issue. If the Commonwealth can disregard its agreements without any consequences, Venture

predicts that vendors like it will stay away from the Commonwealth and invest money elsewhere.

Commonwealth

The Commonwealth does not explicitly address whether the term "public" is ambiguous. At times, it appears that the Commonwealth maintains that the term "public" is not ambiguous as it frames the issue as one of strictly ascertaining legislative intent with respect to whether the General Assembly specifically intended to waive sovereign immunity for these agreements. Commonwealth's Brief at 7 ("The Procurement Code does not contain an express waiver of sovereign immunity for Commonwealth funds used in the construction of private facilities simply because they happen to be accessible to the public."). Simultaneously, the Commonwealth approvingly quotes the Commonwealth Court's analysis of the competing interpretations of "public," indicating it agrees with the Commonwealth Court's holding that the term "public" is ambiguous. *See* Commonwealth's Brief at 16-17. The Commonwealth implicitly forwards the argument that Venture's concession of a statutory ambiguity goes a long way towards a finding that sovereign immunity has not been specifically waived.

The Commonwealth notes that our objective is to "ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). It argues that the Code must be read as a whole to ascertain whether the General Assembly intended to waive its sovereign immunity for these written agreements. "Parts of a statute that are in pari materia, i.e., statutory sections that relate to the same persons or things or the same class of persons and things, are to be construed together, if possible, as one statute." Commonwealth's Brief at 9 (citing 1 Pa.C.S. § 1932).

One part of the Code that must be construed alongside Sections 102 and 103 is the Code's reaffirmation of sovereign immunity. 62 Pa.C.S. § 1702(a). Thus, whereas Venture cites 1 Pa.C.S. § 1928(b)(7) for the proposition that provisions decreasing jurisdiction must be strictly construed, the Commonwealth offers that Venture's argument does not adequately account for this reaffirmation. Additionally, sovereign immunity is based in the constitution and implicates the separation of powers among the branches. Because the Board only has jurisdiction in situations where sovereign immunity has been waived, the Commonwealth argues that the jurisdictional and sovereign immunity concerns overlap.

The Commonwealth also argues that other parts of the Code make clear that the General Assembly intended the term "public" to require governmental ownership and/or control. It first emphasizes multiple portions of Section 103's definition of "construction."

> The process of building, altering, repairing, improving or demolishing any **public structure or building** or other **public improvements** of any kind to any **public real property**. The term does not include the routine operation or maintenance of existing structures, buildings or real property.

Commonwealth's Brief at 8 (supplying emphases). While none of these terms is separately defined, "the common denominator in each is **public** rather than private." *Id*. The term "public building" always includes "that which is owned by a government entity" but only sometimes includes access to the public at large. In this sense, a building that is "accessible to the public" comprises a subtype of buildings or structures that are otherwise owned or controlled by the government. Thus, the term requires the government to own and/or control for the public's ability to access to become relevant.

The Commonwealth further notes that the Code elsewhere separately defines "public facility" as "[a]ny building, airport, school, park, hospital or other structure, grounds or place owned or operated by a government agency, whether for governmental or proprietary use." 62 Pa.C.S. § 4302. Thus, by linking "public facility" to something "owned or operated by a government agency," the General Assembly intended the same meaning for all instances of "public."

The Commonwealth also urges this Court to conclude that the Code and related statutory schemes discussed in the Commonwealth Court's opinion share the goals of increasing public visibility and preventing favoritism and fraud. The Commonwealth points out that Venture simultaneously wishes to avail itself of the Code to the extent that the written agreements qualify for the Code's waiver of sovereign immunity while ignoring all other parts of the Code, such as provisions that would have required competitive bidding in the award of these grants.

The Commonwealth adds that Venture's argument that the former Board of Claims Act involves the "same" subject matter is misleading. The 2002 amendments to the Code do not contain the same jurisdictional language. The Commonwealth notes that the broad jurisdictional language relied upon by Venture as set forth within repealed 72 P.S. § 4651-4 differs from the Code's jurisdictional statute. Additionally, "the Procurement Code removes several categories of agreements from its application and, thus, from the Board's jurisdiction[.]" Commonwealth's Brief at 11. "Grants" are one of the categories completely removed from the Code's applicability. Thus, when the Board was incorporated within the Code, its jurisdiction was curtailed with respect to the removed categories. The Commonwealth observes that the Board's jurisdictional statute is not under review.

"While the removal of grants from the Procurement Code determines the Board's jurisdiction, the Board's jurisdictional statute found in Section 1724 is not under direct review." *Id.* at 15.

The Commonwealth faults Venture's argument for not addressing the inclusion of the restriction "for the grantor" within Section 102(f)'s definition of "grant." Venture's interpretation requires that the phrase "for the grantor" extend to something that benefits the public at large. That interpretation would render "for the grantor" language superfluous. That language should be interpreted to mean that there is an "element of ownership or control by the purchasing agency or, at the very least, some other Commonwealth agency." *Id.* at 28.

### V. Analysis

"Statutory interpretation is a matter of law, and our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Spence*, 91 A.3d 44, 46 (Pa. 2014) (citation omitted). "As this case requires us to engage in statutory interpretation, we are mindful of our paramount objective to give effect to the intent of our General Assembly in enacting the particular statute under review." *Commonwealth v. Jacobs*, 39 A.3d 977, 982 (Pa. 2012) (citing 1 Pa.C.S. § 1921(a)). When words of a statute are clear and explicit, we must follow them. *Doe v. Franklin Cty.*, 174 A.3d 593, 605 (Pa. 2017) (considering plain language to determine "whether the General Assembly specifically intended to abrogate the immunity that ordinarily applies to high public officials."). It is only when the language is not explicit that we may examine other considerations.

The dispute in this case centers on the interaction of four statutory provisions. First, Section 1702(b) of the Code waives sovereign immunity "as a bar to claims against

Commonwealth agencies brought in accordance with … Subchapter C (relating to Board of Claims) but only to the extent set forth in this chapter." 62 Pa.C.S. § 1702(b) (footnote omitted). Second, the Board's jurisdictional provision, 62 Pa.C.S. § 1724(a)(1), confers the Board with exclusive jurisdiction over "[a] contract entered into by a Commonwealth agency in accordance with this part" (i.e., the Code). Third, Section 102 ("Application of part") includes the following restriction on the Code's applicability, reproduced below for ease of discussion.

**§ 102. Application of part**

\* \* \*

> **(f) Application to grants**.--This part does not apply to grants. For the purpose of this part, a grant is the furnishing of assistance by the Commonwealth or any person, whether financial or otherwise, to any person to support a program. The term does not include an award whose primary purpose is to procure **construction** for the grantor. Any contract resulting from such an award is not a grant but a procurement contract.

62 Pa.C.S. § 102(f) (emphasis added). Fourth, and finally, Section 103 defines the term "construction" to refer to "the process of building, altering, repairing, improving or demolishing any public structure or building or other public improvements of any kind to any public real property." 62 Pa.C.S. § 103. The term "public" is undefined.

Venture argues that we must strictly construe the entirety of Section 102(f) pursuant to the General Assembly's instruction in Section 1928(b)(7) of the Statutory Construction Act that "[p]rovisions decreasing the jurisdiction of a court of record" must be strictly construed. Therefore, we should resolve the purported ambiguity in favor of the interpretation that ensures the Board can hear the merits of Venture's claim. We disagree.

Venture is correct that Section 102(f) qualifies as a jurisdictional provision and therefore facially implicates the General Assembly's command that we must guard against a result that decreases the Board's jurisdiction. The *Scientific Games* Court established that the Board of Claims lacked jurisdiction over contract claims for non-monetary relief. In so deciding, we elaborated on the intersection of subject matter jurisdiction and sovereign immunity in the context of the Code as follows:

> While more general clarification of the relationship between sovereign immunity and jurisdiction may be appropriate in the arena at large, for present purposes, we regard sovereign immunity as a jurisdictional concern vis-à-vis the Procurement Code. Our understanding, in this regard, is premised on the enactment's self-contained reaffirmation of sovereign immunity, *see* 62 Pa.C.S. § 1702(a), and its explicit, limited waiver of such immunity (among other specified and limited waivers) in connection with a coordinate allocation of "exclusive jurisdiction" to the Board of Claims over claims arising from certain contracts entered into by a Commonwealth agency, *see id.* §§ 1702(b), 1724(a)(1).

*Sci. Games*, 66 A.3d at 757. *See also id.* at 755 ("In other words … the exception to sovereign immunity pertaining to Board–of–Claims jurisdiction defines the extent of the Commonwealth's statutory exception from sovereign immunity for claims arising from contract.").

Here, Section 1702 is the statutory source of the General Assembly's waiver of sovereign immunity. Section 1724(a)(1), in turn, grants the Board jurisdiction over contracts filed in accordance with "this part." "This part" refers to the Code as it is separated into "Part I" and "Part II." Part I is named "The Commonwealth Procurement Code" and Section 101 ("Short title of part") states, "This part shall be known and may be cited as the Commonwealth Procurement Code." Thus, "this part" refers to a contract that is within the Code's coverage. *See Sci. Games*, 66 A.3d at 744 (stating that the 2002

act "reconstituted the Board of Claims … and reposited 'exclusive jurisdiction' in that tribunal to arbitrate claims arising from contracts entered into by Commonwealth agencies in accordance with the Procurement Code"). As a result, Section 102(f), while nominally a definitional provision, functions to define the Board's jurisdiction. Section 102(f) defines the scope of the Code's reach with respect to "grants." Because it defines the scope of the Code's applicability, it simultaneously serves to define the parameters of the Board's subject matter jurisdiction.

Notwithstanding the jurisdictional impact of Section 102(f), Venture's position is flawed because any strict construction of Section 102(f) in favor of expanding the Board's jurisdiction must account for this Court's observations in *Scientific Games* regarding the prominent role of sovereign immunity as expressed by the Code. Indeed, *Scientific Games* noted "the Procurement Code's prominent reaffirmation of sovereign immunity[,]" *Scientific Games*, 66 A.3d at 749 (citing 62 Pa.C.S. § 1702), which implicates the separation of powers. *Id*. at 755 ("In light of the constitutional basis for the General Assembly's allocation of immunity, however, the area implicates the separation of powers among the branches of government also crafted by the framers. Thus, in absence of constitutional infirmity, courts are not free to circumvent the Legislature's statutory immunity directives[.]") (footnote omitted). Venture's brief does not cite Section 1702, let alone offer a substantive argument reconciling the fact that an expansive view of Section 102(f) would undermine that reaffirmation of sovereign immunity. In this context, the dominant purpose of the Code is to create express waivers of sovereign immunity. The creation of jurisdiction in the Board to adjudicate claims where sovereign immunity has been waived is tangential to this dominant purpose.

What is even more problematic with Venture's argument for statutory construction in favor of expansive Board jurisdiction is that the sentences in Section 102(f) upon which it relies for the conclusion that the grant it was awarded to advance an alternative energy production program are extracted from a provision that clearly and unequivocally is intended to limit the Board's jurisdiction. More precisely, Section 102(f) specifically excludes disputes regarding grants from the Board's jurisdiction. Venture's argument is based upon the untenable proposition that in Section 102(f) the General Assembly simultaneously restricted and expanded the jurisdiction of the Board of Claims. For this reason, the cases cited by Venture in support of a finding of Board of Claims jurisdiction are inapposite.

In *Scientific Games*, we stated that the "Commonwealth Court's en banc decision in *Hanover* [*Insurance Co. v. State Workers' Insurance Fund of the Commonwealth*, 35 A.3d 849, 856 (Pa. Commw. 2012),*]* remains the prevailing law of Pennsylvania unless and until the position is reviewed by this Court." *Sci. Games*, 66 A.3d at 753 n.16. Venture relies on *Hanover* and precedents discussed therein for the proposition that "the Procurement Code does not alter or limit the Board's exclusive jurisdiction over contractual claims against the Commonwealth." Venture's Brief at 29 (quoting *Hanover*, 35 A.3d at 856). We therefore examine that decision.

In *Hanover*, the petitioning companies sought a declaration of their rights under an insurance policy issued by the Department of Labor and Industry and State Workers' Insurance Fund. A question arose regarding whether the suit belonged in the Commonwealth Court's original jurisdiction or in the Board of Claims' exclusive jurisdiction. Notably, the Commonwealth respondents argued that the Board did not have

jurisdiction under the 2002 amendments to the Code, as the contracts at issue were not between the petitioners and the Commonwealth agencies.

The *Hanover* Court discussed *Data-Quest*, which "observed that statutory provisions that decrease the jurisdiction of a court of record must be strictly construed … and we cited the well settled principle that when the Legislature seeks to depart from salutary public policy principles, it must express its intention to do so *explicitly*." *Hanover*, 35 A.3d at 854 (citing *Data-Quest*, 972 A.2d at 79). The *Hanover* Court ultimately concluded that "in light of well-settled precedent and the lack of clear legislative intent, we agree that the provisions of the Procurement Code have not altered or limited the exclusive jurisdiction of the Board of Claims over this matter." *Id.* at 856. The *Hanover* Court thereafter transferred the matter to the Board.

Venture maintains that the same result must obtain here because, absent specific language that limits the term "public" to something owned and/or controlled by the government, this Court should not interpret the Section 102(f) jurisdictional provision in a manner that functionally decreases the Board's jurisdiction. *Hanover* and *Data-Quest*, however, both involved contracts that were not expressly excluded from the Code's reach. As *Scientific Games* described the *Hanover* decision, the dispute in that case pertained to whether the Code altered or limited the Board's jurisdiction "over a particular **non-procurement matter**." *Sci. Games*, 66 A.3d at 753 (emphasis added; parenthetically describing *Hanover*'s holding). We cannot ignore that those cases did not involve a provision of the Code like Section 102(f) that expressly excludes a type of agreement from application of the Code and, accordingly, the concomitant preservation of sovereign immunity. *See Commonwealth v. Resto*, 179 A.3d 18, 22 (Pa. 2018) ("[T]o prevent such

loose language from establishing governing law, this Court employs the principle that the holding of a judicial decision is to be read against its facts.").

As stated, in contrast to *Hanover* and *Data-Quest*, the General Assembly has definitively and unambiguously stated that grants are **not** governed by the Code. "This part does not apply to grants." 62 Pa.C.S. § 102(f). No such comparable language exists with respect to the contracts involved in *Hanover* and *Data-Quest*. Indeed, the *Hanover* decision based its conclusion that the Board had jurisdiction in part on the "lack of clear legislative intent" limiting the Board's jurisdiction. *Hanover*, 35 A.3d at 856. Here, in contrast to *Hanover*, there is a clear legislative intent: "grants" are excluded from the Code's operation and thus from the Board's jurisdiction. Although Venture would have us ignore the totality of Section 102(f), to do so requires us to also ignore the explicit purpose of the provision, which is to exclude grants from coverage under the Code.

Moreover, we observe that the paramount objective is ascertainment of legislative intent. In other scenarios where the General Assembly mandates strict construction, such as when analyzing penal statutes, this Court has stated that "[t]he need for strict construction does not require that the words … be given their narrowest possible meaning or that legislative intent be disregarded[.]" *Commonwealth v. Booth*, 766 A.2d 843, 846 (Pa. 2001) (citations omitted). As the question pervading this dispute is whether the General Assembly has waived the Commonwealth's sovereign immunity, we are mindful that we have "consistently held that where the General Assembly intends to provide exceptions to immunity, such exceptions must be specifically and explicitly expressed." *Franklin Cty.,* 174 A.3d at 605. "[E]xceptions to sovereign immunity are to be narrowly construed and … the General Assembly can correct any misinterpretation of the immunity

provisions by amending the statute so as to explicitly waive immunity." *Mullin v. Commonwealth, Dep't of Transp.*, 870 A.2d 773, 786 n.8 (Pa. 2005). We thus decline to strictly construe Section 102(f) in favor of an expansive view of jurisdiction in the Board. Section 102(f) preserves sovereign immunity for disputes involving grants, and the provision in its entirety must be construed in favor of preserving sovereign immunity.

Having rejected Venture's argument, we examine Section 102(f) through the lens of strictly construing its provisions in favor of preserving sovereign immunity. Assuming an ambiguity exists, strict construction of the undefined term "public," as incorporated by Section 102(f)'s inclusion of the defined term "construction," requires that we limit waivers of sovereign immunity. Thus, consistent with the argument advanced by the Commonwealth and the holding of the Commonwealth Court, we agree that "construction" within the context of Section 102(f) requires some element of control or ownership by the Commonwealth.[9]

We agree with the Commonwealth that reading the Code in pari materia compels this result. Particularly, we agree that the Code's reference to a similar statutory scheme, the Separations Act, in conjunction with this Court's analysis of similar language in the General Borough Act, supports a finding that the General Assembly intended for "public" to require an element of governmental control or ownership.

We begin with this Court's decision in *Tragesser*. The Borough of Ambridge had contracted with an engineering company to construct a building for its waterworks system.

---

[9] We need not decide the degree to which the Commonwealth must control or own that which has been "constructed," since in this case the Commonwealth has no ownership, control of, or interest in the admittedly privately-owned CNG fuel pumps located on privately-owned property.

*Tragesser*, 169 A. at 377. A taxpayer filed suit based upon Section 2511 of the General

Borough Act of May 4, 1927, P. L. 519, 634 (53 P.S. § 14811). The statutory text at issue

read:

> In the preparation of specifications for the erection or alteration of any public building, when the entire cost of such work shall exceed one thousand dollars, it shall be the duty of the architect, engineer, or person preparing such specifications, to prepare separate specifications for the plumbing, heating, ventilating, and electrical work; and the borough shall receive separate bids upon each of the said branches of work and award the contract for the same to the lowest responsible bidder.

*Tragesser*, 169 A. at 377.

The suit concerned the fact that the engineering company awarded the contract

was not the lowest bidder for the heating and electrical work as required by the Borough

Act. *Id.* The court below dismissed the suit and the plaintiffs appealed.

The appellees argued that the waterworks building was not a "public building" per

the statute, "which, they say, relates only 'to public buildings where the public

congregates, and where, therefore, their comfort, convenience and safety must be looked

after.'" *Id*. at 378. The Court summarily rejected that argument.

> We may agree that adequate plumbing, heating, and ventilating will do more good where a hundred people constantly congregate than where but a few sometimes do, but that furnishes no reason for excluding the few from all benefit of the public policy embodied in the statute. Certainly it does not justify us in construing the '*any* public building' of section 2511 as meaning *some* public buildings only.

*Id.* The subsequent paragraph elaborated on the "public policy embodied in the statute."

> Section 2511, above quoted, and section 2512 (P. L. 1927, p. 634, repealed by P. L. 1929, p. 1587) which, of course, immediately follows it, both relate to plans and specifications of "any public building," are both in article 25, entitled "Public Buildings and Works," and both must be construed, quoad the

statute, to refer, as their words in fact state, to "any public building," that is, any building owned or to be owned by the borough and used or to be used for public purposes.

*Id.*

Next, in *Mechanical Contractors* the Commonwealth Court cited a case approvingly quoting that part of *Tragesser*'s holding. The Senior Citizen Health Care Council of Erie County ("Council") solicited bids in accordance with the Third Class City Code for renovations to be made to a publicly-accessible building acquired for its future headquarters. A group of contractors filed suit seeking an injunction requiring Council "to provide and advertise separate specifications for plumbing, heating, ventilation, electrical, and general contract work." That request was based on Section 1909 of the Third Class City Code, "popularly known as the Separations Act," and which stated, in relevant part:

> In the preparation of specifications for the erection, construction, and alteration of any public building, when the entire cost of such work shall exceed ten thousand dollars, the architect, engineer, or other person preparing such specifications, shall prepare only the following separate specifications [:] (1) plumbing, (2) heating, (3) ventilating, (4) electrical work, (5) elevators and moving stairs, and (6) one complete set of specifications for all the other work to be done in such erection, construction and alteration.

*Mech. Contractors*, 674 A.2d at 754 (quoting 53 P.S. § 36909).

The *Mechanical Contractors* Court stated that "the initial inquiry is whether the erection, construction, or alteration is being done by, or on behalf of" the city. *Id.* The "second requirement in applying the Separations Act is that the construction or alteration is to a public building." *Id.*[10] Ultimately, the plaintiffs lost on two independent grounds.

_____

[10] As a technical matter, the *Mechanical Contractors* Court explained that the Separations Act "was originally enacted by the Act of May 1, 1913, P.L. 155, *as amended,* 53 P.S. §

The first was that the City had no ownership interest in the property; Council, not the City, operated the senior center and Council did not act as the City's alter ego. Second, and the point relevant to this dispute, "a 'public building' for the purposes of the Separations Act is one owned or to be owned and used by a government entity (or its alter ego) for a government-authorized public purpose." *Id*. at 755. (indirectly citing *Tragesser*). Accordingly, it was irrelevant that the property was open to the public.

The Commonwealth directs our attention to Section 322 of the Code, which requires that certain "construction" contracts separately comply with the Separations Act text analyzed by *Mechanical Contractors*. That statute states:

> (6) For construction contracts where the total construction costs are less than $25,000, the department shall not be required to comply with the act of May 1, 1913 (P.L. 155, No. 104), entitled "An act regulating the letting of certain contracts for the erection, construction, and alteration of public buildings," and the department may award such contracts in accordance with section 511. All projects equal to or exceeding $25,000 shall be subject to the act of May 1, 1913 (P.L. 155, No. 104), entitled "An act regulating the letting of certain contracts for the erection, construction, and alteration of public buildings."

62 Pa.C.S. § 322(6).

We agree with the Commonwealth that this requirement establishes that the Code, the Separations Act, and General Borough Act all share a similar goal. Thus, the *Tragesser* interpretation of almost identical language is evidence that the General Assembly intended the same result in Section 102(f) of the Code. *See* 1 Pa.C.S. § 1921(c)(5) ("When the words of the statute are not explicit, the intention of the General

---

1003; it was repealed in 1931 as to third class cities when the requirement was added to The Third Class City Code." 674 A.2d at 753 n.1.

Assembly may be ascertained by considering … [t]he former law, if any, including other statutes upon the same or similar subjects."). As we have discussed, these three statutes all require governmental entities to comply with certain regulations and procedures before awarding contracts, and Venture offers no explanation for why the Procurement Code would ever apply to the construction of something that the Commonwealth will not profit from, own, or control. In fact, the very name "Procurement Code" indicates that it applies only when the Commonwealth procures something. The commonsense conclusion is that, in the context of the definition of "construction" in Section 102(f), it applies only to "public" things as understood by *Tragesser* and *Mechanical Contractors*. The General Assembly is presumptively aware of our interpretation of the term "public" and "in subsequent statutes on the same subject matter intends the same construction to be placed upon such language." 1 Pa.C.S. § 1922(4). Moreover, the Code itself states, "Unless displaced by the particular provisions of this part, existing Pennsylvania law, including Title 13 (relating to commercial code), shall supplement the provisions of this part." 62 Pa.C.S. § 104. The Commonwealth Court's resolution of the purported ambiguity fits this overall framework. Venture's interpretation does not.

Indeed, Venture offers a disconnected argument for what the Commonwealth procured in this case. It claims that the Commonwealth created the ACE program "to procure the utilization, development, and construction of alternative and clean energy projects in the Commonwealth[.]" Venture's Brief at 5. But if we were to accept that the General Assembly intended for the Code to extend to aspirational concepts like cleaner energy, then there is no distinction between a privately-owned fueling station that is completely inaccessible to the public and the fueling stations at issue here. In the former

scenario, Venture agrees that the Board would lack jurisdiction because there is no "public" element, but in the latter the Board has jurisdiction because the public can enter the property. Yet, in either case the Commonwealth is still "procuring" cleaner air. As in *Mechanical Contractors*, the fact that something is open to the public is not enough.

The Code is relevant only if the government acquires some kind of ownership or control of the thing constructed. Here, the construction was of privately-owned fuel pumps. Under Section 102(f), a "grant" does not include an award where the primary purpose is to procure construction for the grantor. Here, the construction of the fuel pumps was for a private entity, not the Commonwealth grantor. Thus, the award here was a grant.

Finally, the fact that the General Assembly must specifically waive sovereign immunity reinforces the foregoing conclusion. Venture concedes that Section 102(f) "makes an exception for grants, generally, from the Board's jurisdiction" but maintains that Section 102(f) "provides an exception to the exception … when the Commonwealth provides grants with a primary purpose to procure 'construction' for the Commonwealth[.]" Venture's Brief at 15-16. To the extent this argument accurately describes the function of Section 102(f), the Commonwealth again prevails.[11] "Because the legislature's intent in both the Sovereign Immunity and Tort Claims Acts is to shield government from liability, except as provided for in the statutes themselves, we apply a rule of strict construction in interpreting these exceptions." *Jones v. Se. Pa. Transp. Auth.*, 772 A.2d 435, 440 (Pa.

---

[11] It would be highly irregular for the General Assembly to categorically remove grants from the Code's operation while simultaneously waiving sovereign immunity within an "exception to the exception." In this regard, we believe that the Board's description of Section 102(f) as announcing an "exclusion" is more apt.

2001). We must apply the same logic to the Code. Hence, any ambiguity must be resolved in favor of preserving sovereign immunity. "The constitutionally-grounded, statutory doctrine of sovereign immunity obviously serves to protect government policymaking prerogatives and the public fisc." *Sci. Games*, 66 A.3d at 755. Here, where the Commonwealth did not gain any kind of ownership or control of the CNG pumps, let alone ownership or control of the privately-owned stations, we agree with the Commonwealth that the General Assembly did not waive its sovereign immunity.

Secondarily, we note again that Venture's framing of the issue largely avoids the first two sentences of Section 102(f). Venture avers that these agreements cannot be "grants" and are instead "procurement contracts" because of the asserted ambiguity involved within the Section 102(f) text regarding "construction." We would agree that sovereign immunity would be waived if these agreements were "procurement contracts," insofar as a "procurement contract" qualifies as a contract that is governed by the Code and for which sovereign immunity has been specifically waived. *See id.* As explained, Venture would not prevail because the General Assembly would not have intended for "public" to include a privately-owned structure that is merely open to the public. Nonetheless, we address the grant agreements in light of a plain reading of Section 102(f) and conclude that Venture was given a grant for purposes of Section 102(f).

Section 102(f) states, "For the purpose of this part, a grant is the furnishing of assistance by the Commonwealth or any person, whether financial or otherwise, to any person to support a program." Venture concedes that this case indeed involves "a grant," but contends that the grant was awarded "with a primary purpose to procure construction." Section 102(f)'s text establishes a binary choice: if the written agreements are grants,

then they are not "procurement contracts," and vice versa. Contrary to Venture's representation, a "grant with a primary purpose to procure construction" is a statutory impossibility. If the written agreements were for the "primary purpose to procure construction," they cannot be characterized as a grant at all. A contract that is designed to procure "construction for the grantor" is not a grant.

A straightforward examination of Section 102(f)'s plain language demonstrates that these written agreements were "grants" because the grant was given to "furnish[ ] … assistance … to any person to support a program." The funds were given to promote the Commonwealth's Alternative and Clean Energy program. The Commonwealth agreed to provide grant funds to support Venture's plans to add CNG pumps at existing service stations. Venture anticipated that these pumping stations would generate revenue and eventually a profit for the benefit of Venture. Indeed, Venture's application for the Fredericksburg station informed the Commonwealth that Venture had a contract with a commercial trucking company that agreed to purchase an agreed amount of fuel upon completion of the project. The Commonwealth received nothing from that deal other than the advancement of its desire to promote the ACE program and reduce harmful emissions. Everything within the grant applications indicated that Venture stood to profit from these projects, and, as the Board found, "no proceeds from the CNG fuel sales operation flow to the [Commonwealth]. In addition, there is no evidence of any ownership or interest of the [Commonwealth] in either the facility or in the property on which the CNG fueling station facilities are located." Board's Final Opinion and Order, 12/28/2018, at 3. The Commonwealth simply made available grant money to further incentivize private companies. We have acknowledged that "some immunity applications may be distasteful

to those who may discern government wrongdoing[.]" *Sci. Games*, 66 A.3d at 755. But to the extent that Venture challenges the wisdom of affirming the Commonwealth Court based on public policy issues, as in *Scientific Games* the merits-based issues are subordinate to the jurisdictional concern.

In this regard, we note that dictionary definitions of the term "grant" corroborate this conclusion. While the parameters of what Venture calls the "grant exception" is self-defined by Section 102(f), the term "grant" is not otherwise defined by the definitions section of the Code. The General Assembly instructs that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage … ." 1 Pa.C.S. § 1903. In ordinary usage, the definition of "grant" applicable to this scenario is "something granted *especially*: a gift (as of land or money) for a particular purpose." *See Grant*, MERRIAM-WEBSTER ONLINE DICTIONARY. That definition tracks Section 102's description of a grant as "the furnishing of assistance by the Commonwealth or any person, whether financial or otherwise, to any person to support a program." 62 Pa.C.S. § 102(f). The Commonwealth conditionally gifted money for the particular environmental purpose of promoting clean energy projects. Per Black's Law Dictionary, the word "grant" is synonymous under these circumstances with "subsidy." It defines the term "subsidy" as follows:

> **1.** A grant, usu. made by the government, to any enterprise whose promotion is considered to be in the public interest. • Although governments sometimes make direct payments (such as cash grants), subsidies are usu. indirect. They may take the form of research-and-development support, tax breaks, provision of raw materials at below-market prices, or low-interest loans or low-interest export credits guaranteed by a government agency. — **Also termed *grant***.

*Subsidy*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added).

As with the ordinary definition of the term, this synonym definition illustrates that a "grant" is understood as something that promotes the public interest. The Commonwealth gifted Venture the grant funds, subject to the conditions it outlined within the agreements. These written agreements were designed to further the Commonwealth's clean energy policy as codified in the Alternative Energy Investment Act, which authorized the CFA to create the ACE program. 73 P.S. § 1649.307(a)(1)(iii) (providing funds for "[l]oans and grants to businesses or nonprofit economic development organizations for alternative energy production projects.").[12] Accordingly, these written agreements explicitly qualify as "furnishing … assistance by the Commonwealth … to any person to support a program." 62 Pa.C.S. § 102(f). Because these agreements meet that definition, they qualify as "grants," and the Code does not apply. As a result, the Board correctly granted the Commonwealth's preliminary objections.

Order affirmed.

Chief Justice Baer and Justices Saylor, Todd, Dougherty, Wecht and Mundy join the opinion.

---

[12] The General Assembly has also excluded loans from the Code. 62 Pa.C.S. § 102(f.1) ("This part does not apply to loans.").